Thank you, Your Honor. May it please the Court, my name is William Witherspoon, a certified law student. My supervising attorneys are at counsel's table, Anjana Malhotra and Robert Chang, and we represent the plaintiff appellant, Monty Hoisington. With the Court's permission, I'd like to reserve two minutes for rebuttal. Kind of keep track of your own time. We'll maybe give you a little nudge. All right. Thank you. Every time Monty Hoisington has to go off-island to receive necessary medical care, he's strip-searched twice. His body cavities are visually inspected, even though he's shackled with leg irons, a waist chain, and handcuffs. Mr. Witherspoon, we are familiar with the facts, and because we don't have a lot of time, I want to kind of get to the nub of this. What we're really talking about is whether the standards that apply to civil detainees, such as your client, are the same as those that apply to pretrial criminal defense. Isn't that really the big issue before us? Well, I'll put a slightly finer point on it. Jones v. Blanas explains that to treat a civil detainee the same way that you treat a prisoner is presumptively punitive, and then it lays out the test for if it's excessive in relation to its non-punitive purpose. When you say prisoner, not distinguishing between pretrial detainees and convicted prisoners. Is that right? Well, in Jones v. Blanas, I think the court was referring to convicted criminals. One thing that I find distracting is that in several other cases, there were a whole host of different conditions that were considered and sort of a consideration of the overall environment that the resident or prisoner was living in. But in this case, Mr. Hoisington is asking us to look at just one aspect of his confinement, which is the transportation, and that seems to be the riskiest part of the whole operation. Well, this case is distinguishable from Jones on that point, but courts in the circuit have looked at portions of the conditions of confinement. What's wrong with what they're doing, given that this is, if you just accept the premise, that this is the riskiest part of the operation, that is, transporting a prisoner or resident on and off, in and out of the facility? What's wrong with what they're doing? Well, it's excessive in relation to their legitimate security interests. They absolutely have a legitimate security interest. But whose burden is it to show that, counsel? You're obviously familiar with the Florence case. Sure. The Supreme Court was very clear that we give deference to the professionals, if you will, in this case. And in this situation, the woman who is in charge of the facility indicated there had been, I forget, the number of escapes and attempts to escape and other issues of that like. And she made a professional determination that it would be highly dangerous to allow people to come back and forth bringing contraband and or increasing their chances of escape, to either not have them shackled or to not have the search. Don't we have to defer under Florence, assuming that the standard is the same, for pretrial criminal defendants and civil defendants or civil detainees, such as your client? Don't we have to give deference to the professionals here? And isn't it your client's burden to show otherwise? Well, with respect to deference, I don't think that the defendants are entitled to that deference here. Much like Sharp v. Weston. Excuse me, counsel. Isn't that exactly what Florence said, though? If Florence applies, the court was very clear that we do have to give deference unless your client bears a very, very high burden to show otherwise. Isn't that correct? Well, so the professional judgment standard, I believe, springs from Youngberg. But Youngberg was over, not overturned, distinguished by Florence, wasn't it? Well, in terms of the professional judgment being exercised, there still must be a showing that professional judgment was exercised, and that hasn't happened here. Just like in Sharp v. Weston, where the court determined that the SEC defendants simply adopted DOC policies wholesale, it was not a treatment-directed decision. That was an important part of the district court's opinion. Was that done on a per capita basis, or are you talking about for the whole population that is involved in this transportation? It was the whole population in the Turay case. In Turay, the court enjoined strip searches from being performed after contact visits, because the professional opinion was unanimous that it was profoundly inimical to successful treatment. The SEC clinical director called the strip searches an abomination, and the district court said because it wasn't a treatment-directed decision to just farm the security out to the DOC and let them do it their way, that it wasn't entitled to deference because it wasn't a professional judgment. But again, that case was talking about a whole constellation of conditions, and that's the problem I've got getting back to my first question. When you said that they enjoined that aspect, they were enjoining a lot of different conditions that were at issue at that point. They were, but with respect to the professional judgment at that point, it was the DOC performing those strip searches. So we don't have anything in the record that tells us that this is an abomination to the therapeutic environment. At this point, we don't. Well, what we don't have is any statement on behalf of the SEC defendants that they even considered the treatment environment. Well, it says in their professional opinion. That's the declarations we have in their professional opinion, right? That security justifies it, and we've challenged that too, and I'll get to that in just a second. But there's absolutely no evidence that they considered the treatment environment. And when you have such a clear holding in Toray and upheld by this court in Sharp, how do you not consider the treatment environment?  Absolutely. There are at least questions of fact material to whether these restrictions were excessive in relation to the defendant's legitimate non-punitive purpose. Could I ask one other question about this? Because I couldn't see it anywhere in the record, and I really look for it, and that is whether they're given the record as it existed at the time, understanding that the motion to supplement was denied. Is there anything in the record that tells me whether or not Mr. Hosington had any interaction with criminal inmates or prisoners at anywhere along the line, or were they totally segregated? Well, during transport, they're on the same ferry. So when they go to the sort of segregated unit on the ferry, was that used by criminal inmates as well as residents of the SEC? I don't think the record gets to that level of specificity. It doesn't tell me that. All right. I do want to point out, I'm mindful I'm short on time, but when the court joined the strip searches in Toray, the defendants had to come up with alternatives in the context of contact visits, and they developed alternatives. They have a metal detector and a full-body X-ray scanner that's in use in the visiting room, and that's to promote security and to prevent the introduction of contraband. Now, when they have those alternatives readily available, the choice to humiliate and degrade with just the profoundly intrusive strip search, it at least raises a question. This gets us back to the question at least that I started with, which is, does Florence apply? Because the Supreme Court expressly talked about the fact that we're not going to get into a case-by-case analysis of whether the professionals were right or they were wrong. It would foster thousands and thousands and thousands of cases, and they didn't want to do that. So I think ultimately, perhaps on your rebuttal time, we can talk a little bit about the nub question, which is, is the standard for pretrial detainees in a criminal setting the same as the standard that we apply to civil detainees like Mr. Huizington? Why don't we reserve time? We'll give you a little extra, too. You're doing a fine job. Hang in there. Okay. Let's hear from the government. Good morning, Your Honors. My name is Donna Hamilton, Assistant Attorney General, and my co-counsel, Teresa Fricke, is with me this morning. This case is about SCC's secure transportation protocol of dangerous people into the community, specifically Monty Huizington, who has multiple convictions for raping women at knife point. This case is about security in the community during the transportation and security at the SCC when the resident leaves, when Mr. Huizington leaves the SCC to go through the community, and then when he returns to the SCC to ensure that he's not bringing contraband into the facility. Well, what are you saying? He should be treated the same as a criminal? I'm sorry? What are you saying? He should be treated the same as a criminal? Not at all. Well, but you're not focusing on the question, then. First of all, what's your response to Mr. Witherspoon's argument that, well, in this case, they really didn't consider any of the treatment considerations in deciding the level and the kind of security that should be used on these transportation runs? Secure transportation. First of all, were these professional mental health considerations taken into account? Does the record show that? Secure transportation in the community is not a treatment activity. It's a transportation activity. Well, what are you saying? The treatment considerations should be completely ignored in deciding what's secure? Sex offender treatment conditions of confinement are not the same as transportation securely in the community. That's what the Toray injunction was about. It was about treatment at the SCC. It addressed a number of issues regarding treatment, and when the court in Toray addressed the issue of strip searches, it enjoined the SCC from conducting strip searches after contact visits where the residents did not leave the island. The court in Toray specifically said there may be situations where residents have an opportunity to be transported through the community, and in that case, having the Department of Corrections at that time conduct these transportations and apply the procedures that they apply is not inappropriate. So what we have, particularly for the issue of qualified immunity, the Toray injunction was not dismissed until March of 2007. So until 2007, it was over all the years of the injunction, which I believe was 14, SCC was never enjoined from this practice that it has been using since at least 1998. The practice remains the same except it's not in the record, but the Department of Corrections is no longer on the island. Counsel, I don't think I heard an answer to Judge Tashima's question, and he asked a pretty specific one, and that is, is there anything in the record that tells us that the treatment aspect of this transportation activity was considered? You've just asserted this is not a treatment activity. Where do I find that in the record? It's not in the record specifically that sex offender treatment was part of this protocol because it's not a treatment protocol. I think the question is really whether or not the opposing counsel is making the argument that there's nothing that shows that they considered the treatment ramifications when they adopted this protocol, and that's what I'm asking. Did they? They considered primarily the safety and security protocol needs, which is number one. When you say they, you're talking about which division? The professionals at the Special Commitment Center, including Associate Superintendent Kathy Harris, who provided her declaration. In other words, officials at the SCC had a say in the conditions that were imposed on the transportation of prisoners by the corrections people? Not the transportation of prisoners, the transportation of residents. Prisoners were on the island at the time. Transportation of residents. Exactly. So they were able to tell the corrections personnel what conditions should prevail when these treatment prisoners, I'll call them, were transported off island? In other words, are you saying that the SCC dictated those terms? If you are, give me a record citation. The record does not address that specifically. Then what do you base your assertion on? On the fact that this process? My assertion that this is not a treatment protocol is based on the fact that? No, no, no. The assertion that, you know, you said they considered the treatment considerations, and when I asked you who they was in making these transportation arrangements and conditions, I said who the they was, and you said it was SCC. So I'm asking you what in the record shows that the SCC had an input in determining what the conditions of transportation were? The Declaration of Kathy Harris discusses the various issues regarding why the SCC determined the protocols that it selected, the considerations for that. In the Torre injunction, which was in place at the time, the court addressed, is it necessary for the SCC to avoid any Department of Corrections working together, interagency agreements with regard to transportation? The answer was no. So this is about security and transportation. And the record, when things changed after this case was decided, I don't really know how to get to, the protocols today remain the same as they were at the time, other than the people doing it. I'm sorry, I'm having difficulty saying about something that's not in the record. We understand. I have a question following up on my colleague's points, that your opposing counsel has raised the concept that there are less intrusive ways to do that. I think he referred to the scanning device and so on that was available. And in our Jones case, we indicated that while there is a presumption, and certainly that's enhanced with the Florence, a presumption that we defer to the professionals, in this case Ms. Harris and others who have contributed to the record, the presumption can be rebutted if they show that it's a problem. It can be rebutted by the government if the government can show that, and I'm quoting here, legitimate non-punity purposes are involved and that it's not excessive in relation to this purpose and could not have been accomplished by alternative and less harsh methods. So in this case, I wonder, has there been any analysis of the specific alternatives that might be considered? And would you address that? Yes. Mr. Hoisington asserts that the SEC has a piece of equipment. The SEC does not use that piece of equipment, and the reason it does not use it is not in the record. But the SEC has considered the various options, and yes, courts will defer to the experts in the field who are dealing with these safety issues on a daily basis. Is there anything in the record that shows what was considered, who considered it, and how the determination was made? The closest I would say is the declaration of Kathy Harris that talks about the reasons for why the SEC does what it does. Okay, so hers was more of a summary, as I recall. She did cite previous escape attempts and the like, but I don't remember any specific analysis about we consider this as a possibility, rejected it because we consider this, and so on. Am I missing something? No, you're not. And I don't think that you really need to get there. I think that you can decide this case that the record demonstrates that the SEC exercised professional judgment. They made a determination. Whether it's the best determination or not the best determination isn't really the question for the court. What if Ms. Harris concluded that the best way to do this would be to have all of the prisoners tied up in irons with their arms like this on the ship going over and with somebody standing out there with a whip to make certain they didn't move? Would we be required to defer to her professional judgment? Her professional judgment is based on you would defer to it if it were considered reasonable in the professional community with regard to that issue. I guess I have a problem. So the answer to yours is no. I am not aware, and certainly it's not in the record, but I'm not aware of any type of confinement program in this country that would permit such a thing. Okay. What I'm really struggling with is here we have three appellate judges. We're bound by the record. We know the Supreme Court has been very clear that we defer to professionals in terms of security, but they do seem to leave a little air hole in the top for, for want of a better term, cruel and unusual punishment. Don't use that. That's just my term. I understand. But the reality is what triggers that, And what should we be looking at to determine whether that's what's involved here? The burden is on Mr. Hoisington to show that professional judgment was not exercised and that the choice the program selected is not generally accepted by other professionals in the field. In fact, the protocols the SEC uses, there is evidence in the record in Ms. Harris' declaration regarding what other programs do. And we did cite to the record a case that was decided in the, I believe it's the 8th, Minnesota, just this past August on this very issue. And in that case, the circuit court said that whether under the Youngberg standard or under Bell, either way the petitioners in that case came forward with no evidence that professional judgment was not exercised. And the facts mirror the protocols that the Special Commitment Center uses. Do either of my colleagues have further questions? If not, thanks very much for your presentation. We'll hear from our young advocate again here. Thank you. I've got about 50 points that I want to make. That's going to be hard. Sorry. So where to start? First, Judge Teshima, to answer your question about whether the SEC has any say in the DOC's transportation of the residents, they don't. The declaration of Mr. Van Boning at ER 104 explicitly says the SEC residents and DOC prisoners are treated absolutely the same. The SEC defendants even say they don't have access to the DOC policies. So they can't even review the policy to determine if it's appropriate. That's at ER 72. So that's more evidence of the lack of professional judgment that was applied. They don't have access to the policy. How can they determine if it's appropriate for their security needs or if it's appropriate for the treatment mission of the SEC? What about Mr. Huizington's allegation in his complaint that he was stripped shirts on one occasion outdoors and that it was videotaped? Was there any response in the record to that? There was. It was before. Time barred was one of the responses, and it was during the transfer from when the SEC was within the confines of the prison when it moved to its stand-alone facility. We're not focusing on that episode here. Are you still pursuing a claim for injunctive relief? Absolutely. The fact that, you know, the rumored fact that the DOC is no longer involved wouldn't affect the error that the court made on the record below, and it wouldn't affect the scope of the injunction, because whether it's SEC people escorting them or DOC people, it doesn't matter. They should be stopped from performing these policies. Now, with respect, Judge Smith, to your question. Let me get back to this. I don't know if it's a question of mootness, but as your opponent stated that DOC is no longer involved, doesn't that sort of completely change the picture in terms of injunctive relief? I mean, what's the point of, you know, issuing an injunction on the basis of DOC practices if the DOC is no longer there? In other words, the gist of the complaint here seems to be that these civilly committed prisoners are treated the same as convicted criminals, and if the DOC is not involved, that assertion is hard to make. So it seems to be a different claim, isn't it? Well, certainly the presence of the DOC may be something that the district court would want to consider when fashioning the injunction. But if it's SEC personnel who are doing the exact same things that DOC personnel are doing now, then it's still not okay. Well, we don't know that, do we? I mean, obviously things would change if DOC is not involved. Sure, and that should be considered by the lower court upon remand. I will let you finish your point. You were going to respond to what I had asked you. Florence, I think the main distinguishing point is that it relied on Turner v. Safley, which functions in the criminal detainee world, and that's not where we are here. Mr. Roisington is a civil detainee. The defense talked about his history over 20 years ago committing crimes. But since then, in his 10 years in prison and his 11, at least 11 years at the SEC, he's had a completely clean record. He's never assaulted anybody, never tried to escape, never had any contraband. But under Florence, would you concede that if he had interaction with prisoners in a jail or in a prison, not residents but prisoners, under Florence, wouldn't you concede that your case would be on life support right about now? That would be a serious problem for you, wouldn't it? Because that's what the Supreme Court was concerned about, is contraband smuggling within a prison population, yes? Right, in a general jail population. I would say if they're on the same ferry and they're all shackled and they can't communicate with each other, I mean, they can't pass anything to each other. So it wouldn't have anything to do with whether he was convicted or not convicted. As Judge Smith said, Florence was talking about a pretrial detainee, somebody who hadn't been convicted. It was a really minor offense. Right, but the contraband problem was the issue in that case. Absolutely, and it was introducing them into the general jail population that was the problem. Right, so if Mr. – go ahead. I'm sorry, it was going from a very contraband-rich environment, the world, and every opportunity in the world to stash it in a body cavity, and then going into a secure facility, and that's just not at all what we have here. You have a secure environment going to a really secure environment with the resident shackled with two guards accompanying them to every medical procedure. Even during surgery, the guards are in the room. But to answer Judge Smith's question, Florence would control, wouldn't it, if Mr. Hoisington was going to have any contact with a general prison population? If he was going to be just introduced into a general jail population, I might agree unless there's substantial evidence in the record to indicate that the officials have exaggerated their response to those considerations. What have you put forth in the record to suggest that there was, in fact, an exaggerated response here like a Jones-type response, and what have you proposed in the alternative, if anything? Well, what we've put in the record is the fact that Mr. Hoisington is restrained such that he can move his hands three inches. I understand that, but what have you, well, I suppose that could answer the question a little bit. You're just saying it's just too much. It's impossible for him to obtain contraband while off-island. When you've got two DOC guards watching your every move, Mr. Hoisington explained that the DOC guards don't let anybody near the resident as they're escorting him, and he can move his hands three inches or less. He's certainly not going to be able to obtain contraband and put it in a body cavity on the other side of his jumpsuit. Would you agree that under Florence, if he's in contact with general jail population persons who are not civil detainees, that that would be permitted? You know, I haven't given that a whole lot of thought because that's not the situation that we have here. Well, don't you have convicted criminals, not just pre-trial detainees, but convicted criminals who are also coming on the boat across from the island to the mainland? Is that incorrect? That is correct, but I would distinguish that strongly from general jail population where you have people floating around freely handing things back and forth, and there's a barter system kind of market. Being on a boat for 20 minutes with somebody when you're shackled and can barely move, you've got two guards apiece, it's extremely unrealistic to suggest that they're going to pass contraband between them. I just want to see if I can find this here. I think in the declaration of Ms. Harris, she indicated that there had been a previous experience on transportation back and forth from the island, and a certain number of people had escaped, and they found a certain amount of contraband. You probably know what I'm referring to. I'm just looking for the page here. One incident where a resident used maize, or two residents, but that was with the assistance of an SEC employee that that was smuggled in. That actually wasn't at the SEC. I believe that was another jurisdiction that they referred to. I think it was Illinois. Okay. Judge Smith is recalling an incident involving this case. Are we wrong? The one incident that they did refer to about an attempted escape was Richard Turay, and it was when custody was being transferred from the DOC, from being a prisoner to the SEC, and the record suggests that he wasn't restrained in any way before that escape attempt. The backup was called, and then they restrained him. But wouldn't that be evidence that would suggest that the DOC or the SEC, as the case may be, would have a reason to restrain him, so you wouldn't have that situation? Certainly some restraints are going to be warranted. The Washington Administrative Code has promulgated, the DSHS promulgated a provision of the Washington Administrative Code 388.881.10 that requires the SEC superintendent or his designee to determine the use and type of restraints for each escorted leave on an individualized basis. Any further questions? I'm sure the government would agree. We've done an outstanding job. You're a better lawyer than a lot that we see here, and so we encourage you to continue your appellate advocacy. I'm sure you'll be a very fine member of the bar. Thank you both for your presentation. This is a very interesting and difficult case in a lot of ways. The Supreme Court is leading us in new directions, and we have to see if we can tie the knot here appropriately. But thank you both for your argument, and the case just argued is submitted. Thank you very much. Thank you. We will now hear argument in the case of United States v. Lyra.
judges: Tashima, Smith, Christen